1

2

3

4

5

6                              IN THE UNITED STATES DISTRICT COURT

7                           FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10     ALTON A. KING,                                No. C 11-02792-SI

11            Petitioner,                            **ORDER DENYING PETITION FOR
                                                     WRIT OF HABEAS CORPUS AND
12     v.                                            DENYING CERTIFICATE OF
                                                     APPEALABILITY**
13     DERRAL G. ADAMS, Warden,

14            Respondent.
       _____/

15

16

17                                       **INTRODUCTION**

18            Alton A. King, a prisoner in the custody of the California Department of Corrections, filed this

19     petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2008 conviction from

20     the Santa Clara County Superior Court.  This matter is now before the Court for consideration of the

21     merits of the petition.  For the reasons discussed below, the petition is DENIED.

22

23                                        **BACKGROUND**

24     **I.    The Crime**

25            King was convicted in Santa Clara County Superior Court of continuous sexual abuse of a child

26     under fourteen years in violation of California Penal Code § 288.5(a) and lewd and lascivious act on a

27     child under fourteen in violation of California Penal Code § 288(a).  The following factual background

28     is taken from the order of the California Court of Appeal:

United States District Court
For the Northern District of California

*D.'s Mother*

In August 1993, just before the start of the school year, D., his brother C. and their mother moved to an apartment near their local Seventh Day Adventist Church. Beginning on August 23, 1993, the children attended the church's school (the Church School). Appellant and his family attended the same church and school as D.

Appellant used to see D. and his brother waiting at the bus stop and began giving them rides. Subsequently, appellant's family and D.'s family began to spend holidays together. In addition, the boys spent at least every other weekend, and sometimes, consecutive weekends at appellant's home.

D. and his brother were involved in a church-sponsored youth organization called Pathfinders. Pathfinders held weekly meetings, which began about 7 p.m. at the church. Pathfinders' activities included camping trips, an annual bike-a-thon, and jamborees.

D. and his family moved to Sacramento on December 26, 1996. In 2004, D.'s mother had a conversation with D.'s brother who disclosed to her that he had been molested by appellant. D.'s mother spoke with D. Eventually, D. admitted that appellant had molested him. D.'s mother called her sister and then reported the matter to the San Jose Police Department. D.'s mother said that she reported the matter, "Because we needed to stop him from getting to somebody else's child."

D.'s mother admitted that she had conducted an Internet search on appellant's name and discovered that appellant had been convicted of molesting other boys. She thought that she had read something on Google or heard something that some of the other boys that had been molested had received money from a lawsuit, but she was not sure whether it was before or after she reported that her boys had been molested by appellant.

*Victim D.*

D. attended the Church School from fifth through seventh grade, ages 11 through 13. [FN1] D. was the same age as appellant's twin children, J1 and J2, and was in the same class. D. confirmed that he was involved in Pathfinders and each week, on the day of the meeting, D. would go to appellant's home after school and then appellant would drive him and his brother to church for the evening meeting. Appellant was a lead counselor who chaperoned, transported children and helped out at events. Appellant nearly always drove D., his brother C., J1, and J2 to the weekly Pathfinder meetings.

> FN1. The parties stipulated that D. commenced attending school on "August 23rd, 94." However, this appears to be a misstatement by the prosecutor because the stipulation then goes on "through June 2nd of '94."

At appellant's home, appellant routinely molested D. on the day of the weekly Pathfinders meeting, on the weekends when D. spent the night and on Pathfinder's camping trips. Appellant would fondle D.'s penis, orally copulate him, and on one occasion sodomized him. Sometimes, appellant would have D. orally copulate him.

D. testified that appellant molested him nearly every time they were alone. However, he described a number of specific instances of sexual abuse.

First, when D. was in fifth grade, he was playing video games alone while sitting on the edge of the bed in the loft playroom in appellant's home. The other children were playing basketball outside or watching television in another part of the house. D. was at appellant's house that day because there was a Pathfinders meeting that evening.

Appellant climbed into the loft, appellant lay[ed] down on the bed behind him and started fondling him over his clothes. D. said that after about 10 minutes, appellant left to check on some food he was cooking. When appellant returned to the loft, he began to fondle D. again, but this time removed D.'s pants and orally copulated him until D. ejaculated.

D. described another incident in which appellant sodomized him. On that day, D.'s brother had stayed at school and appellant had taken his children to the orthodontist and left them there before returning to his house with D. In the guest bedroom, appellant fondled and orally copulated D. After D. ejaculated, appellant went into the bathroom, returned with lotion, which he applied to D.'s anus, and then inserted his penis into D.'s anus. Appellant stopped after D. told him that it hurt. D. testified that since this incident, he is bothered by the smell of lotion because it "brings back bad memories."

D. recounted an incident that happened in Madera County, where the Pathfinders held their annual bike-a-thon (hereafter the Chowchilla incident). While the Pathfinder's leader, Mr. Tupper, played the guitar and lead the children in singing songs, appellant told D. to go to his "truck," a four door Ford Explorer. D. got into the back seat of the vehicle with appellant. Appellant looked around to see if anyone was coming, but did not appear worried. Appellant fondled D. and then orally copulated him until he ejaculated. Next, appellant removed his own clothing and had D. orally copulate him. D. noted that this was not the first time he had orally copulated appellant.

D. testified about an incident that happened in Napa County. This incident took place toward the end of D.'s second year at the Church School, during a Pathfinders' trip to Calistoga Park (hereafter the Calistoga incident). While hiking with the group, appellant pulled D. off to the side on a small trail and then orally copulated D. D. remembered this trip because afterwards he broke out with a poison ivy rash around his genitals and buttocks.

D. told the jury about another incident that he remembered happening at Mount Lassen. D. was staying in a tent with his brother and one other boy. Appellant entered the tent and pretended to tickle and wrestle with the boys, but actually grabbed D.'s genitals. As the boys were falling asleep, appellant pretended to be asleep, but after awhile, appellant started stroking D.'s penis. [FN2]

> FN2. Witnesses testified at length regarding the timing of the Mount Lassen trip, which the prosecution alleged occurred shortly after D. and his brother joined Pathfinders in August of 1993. D.'s brother testified that he had been abused on this trip as well. However, before trial the prosecutor informed the court that he would not use this incident as one of the incidents involving D. Rather, the prosecution elected to use the incident to establish a timeline and for propensity evidence. Accordingly, the parties stipulated that the "Mount Lassen incident will not be sought as a basis to convict the defendant on counts 1, 2, or 3."

D. described an occasion when he was in sixth grade, which occurred after he and his brother had taken the bus home from school. Appellant called D. on the telephone, asked who was home with him and if his mother was there. D. told appellant that he was home with his brother. According to D., "[a]ll of a sudden, he was at the door." Appellant gave D.'s brother some money and asked him to go to the store to buy some sodas. Once D.'s brother left, appellant masturbated D. and then orally copulated him. When D.'s brother returned, appellant drank some soda and left quickly.

D. remembered another incident that occurred when he was in sixth grade that took place at church. In the 20 minutes between the end of Bible class and the church service, appellant pulled D. into one of the youth classrooms and locked the door. The room was

1
2

"pitch black." Appellant directed D. to the back of the classroom, fondled D. under his clothes and as soon as D. had an erection, appellant undid D.'s belt, unzipped D.'s pants and orally copulated him.

3
4

According to D., when he was in seventh grade, appellant drove him to school regularly. On one occasion, appellant reached into the back seat of the car and at every red light fondled D. while pretending to tickle him. According to D., appellant's children were in the front of the car.

5
6
7

D. recounted another occasion that happened while he was in seventh grade that occurred at appellant's house on a Pathfinders' meeting day. D. was playing video games in the loft when appellant entered and began to fondle him over his clothing. After a short time, appellant went downstairs to check on something. When appellant returned to the loft, appellant began to fondle D. under his clothing and tried to remove D.'s pants.

8
9
10

D. refused, telling appellant that he did not want to do "it" anymore and that appellant should go and molest his own children. According to D., appellant told him that he did not do "it" to his own children. D. characterized appellant's demeanor after this incident as "pissed off." D. noted that appellant left abruptly and did not speak to him for the rest of the night.

11
12

After this incident, temporarily, appellant stopped molesting D. for three or four weeks. Eventually, appellant started again, but would give D. gifts or take D. to the store for ice cream or a soda.

13
14
15
16

D. described the next incident as having occurred in the loft area on the day of a Pathfinders' meeting. He was alone playing video games when appellant fondled D. by stroking D.'s penis. The following weekend, D. was at appellant's house where he was watching television in the den. The other children had finished watching television and left the room. Appellant entered the room, fondled D., orally copulated him until he ejaculated and then left the room.

17
18

D. recalled another occasion that happened before a Pathfinders' meeting just after he used the bathroom near the guest bedroom in appellant's house. Appellant appeared in the bedroom, fondled D., orally copulated D. and then had D. orally copulate him. D. remembered this incident because after it was over appellant gave him $25.

19
20

D. testified that there were many occasions during which appellant would wrestle with him and his brother and grab their genitals. On one occasion, appellant's wife walked in during the wrestling and D. thought "She wasn't happy about it."

21
22

D. never spoke to his brother about having been molested, but he did have suspicions that his brother was being molested also.

23
24
25

Appellant ceased molesting D. about one and a half months before D. and his family moved to Sacramento. The last time that appellant fondled and orally copulated D. while in the loft, appellant told D. not to tell anyone about the abuse because D. would be the one who would be in trouble.

26

*1108 Evidence*

27

*Andre Doe*

28

Andre testified that during his freshman year at school he played football. He knew appellant when appellant was a chaperone at a football tournament. One night during

4

the tournament, while sleeping in the choir room at the Fresno Adventist Academy, after the lights were turned out, he was awakened by a hand grabbing his penis over his clothing. Initially, he did not see who had done it, but then he was awakened a second time by someone touching his penis. [FN3] Andre saw appellant on the floor in close proximity to him. Appellant had not been there when Andre awoke the first time. Andre told appellant he needed to speak to him and they "stepped out to a separate room outside of the sleeping area."

> FN3. Andre described the touching as an up and down motion on the shaft of his penis.

Andre asked appellant what he was doing and appellant would not give him an answer. Eventually, appellant told Andre that since he was a doctor, he needed to perform an examination on Andre "because of a deformity that happens to [H]ispanics in their penis." Andre did not want appellant to do anything, but finally appellant convinced him to let him do it. Appellant pulled down Andre's shorts, and masturbated Andre's penis. Andre told appellant to stop and appellant pulled away. Two other students entered the room and asked Andre if he was "doing fine." Andre said yes and went back to sleep. He told appellant to stay away.

*John Doe*

John testified that he knew appellant through his church and first met appellant in 1997 at a church camp in Soquel. John came to know appellant's son and daughter through school as well as church. John explained that in 1997 he would have been going into eighth grade and had classes in common with appellant's son and daughter. John was invited to go to appellant's house, usually after school. Sometimes he would spend the night.

John described an incident that happened at the end of 1998 when appellant asked him to pull down his pants to check how he "was doing physically down there in the groin area." John was under the impression that appellant was a doctor. Appellant started touching and "groping" John. Specifically, appellant touched John's penis and testicles for about a minute. John was 15 years old at this time.

John described a second incident that happened in 1999 at a church camp in Soquel. Again, appellant said that he wanted to examine John. Eventually, after appellant persisted, John went into a tent with appellant. After John pulled down his pants appellant started touching him again. John described the touching as "masturbating" him. At the time appellant was "[m]aking kind of sighs, moaning sounds, grunting . . . ."

John explained to the jury that there was a third incident that happened at appellant's house in the closet where a computer was located. John was sitting at the computer when appellant reached for John's groin area "kind of playing around" and "kept asking [John] to show him." John unzipped his pants, pulled down his boxer shorts and appellant started feeling him in the groin, specifically his penis and testicles. After about a minute, John pulled up his pants and left.

John described other occasions when he would be staying at appellant's house when he was sleeping in the top bunk in J1's room. Appellant would come up and ask John to show him his genitals or appellant would grab John in the groin area. Near the end of 2000, John stopped going to appellant's house because he did not feel comfortable going there anymore.

United States District Court
For the Northern District of California

*Jordan Doe*

Jordan testified that he knew appellant both through church and school. Jordan spent the evening and stayed overnight at appellant's house. Appellant made sexual advances towards Jordan on more than one occasion. Jordan remembered the first incident occurred in the living room of appellant's house. Appellant was watching television when he had Jordan sit down next to him. They started talking about appellant being a doctor and appellant asked Jordan when he had last had a check-up.

Jordan said that it had been awhile. Appellant said he "could help . . . out with that." Appellant persisted until Jordan gave in; the physical consisted of Jordan pulling down his pants and appellant masturbating him. Jordan was 13 years old at the time of this incident.

Jordan recalled a second incident that happened at the church camp in Soquel. While they were cleaning up on the last day of the camp, appellant pulled Jordan into an empty tent and proceeded to give him a "physical exam" that consisted of appellant masturbating him.

A third incident occurred on a school sponsored choir trip in the spring of 2000 when Jordan was 14 years old. They were staying at the Motel 6. Jordan was watching television in his room when appellant came in. Jordan decided that it was time to go to bed, but his friend was in his bed. Appellant told Jordan that he could spend the night in his room. Although Jordan did not want to go to appellant's room, appellant persisted and eventually Jordan went with appellant. Once they got to appellant's room, appellant gave Jordan "another physical examination" that consisted of appellant masturbating him until he ejaculated.

Jordan described a fourth incident that happened in appellant's guest room a few months after the previous incident. Again, appellant masturbated him and started to engage in oral sex with Jordan until Jordan pushed him away.

Finally, Jordan recalled an incident that happened in Colorado on another school sponsored choir trip. While they were staying at a motel/lodge, Jordan went to appellant for some advice about a girl. Appellant ended up masturbating Jordan.

The prosecution introduced evidence that appellant was convicted in 2002 of molesting John Doe in November 1999 and Jordan Doe between July 1999 and October 2000. After appellant testified, the prosecution introduced evidence of appellant's convictions of sexual abuse of three additional Doe victims—a second John, Steven, and Christopher, for abuse that occurred between September 1998 and November 2000.

*Child Sexual Abuse Accommodation Syndrome*

Carl Lewis, a senior investigator from the Santa Clara County District Attorney's Office, testified as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS). The court instructed the jury with CALCRIM No. 1193 [FN4] concerning the limited purpose for which the jury could consider the evidence. Mr. Lewis reiterated that CSAAS evidence does not prove that sexual abuse has occurred.

> FN4. CALCRIM No. 1193 as given here provides, "You have heard testimony from Carl Lewis regarding child sexual abuse accommodation syndrome. [¶] Carl Lewis' testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [C.] or [D.]

**United States District Court**
For the Northern District of California

. . . 's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his testimony."

*The Defense Case*

Appellant testified in his own defense that the victims were untruthful and that they were motivated to falsely report abuse in order to recover civil damages. Appellant claimed that he did not pick up D. and his brother after school to go to Pathfinder meetings, or at least until 1995. He was not a member of the Pathfinders and was too disabled to take trips with Pathfinders or climb into the loft where D. claimed he was molested.

Appellant admitted his prior convictions for molesting other victims and for embezzlement. In addition, he admitted he orally copulated Jordan, and molested John and Steven at his home. Appellant said that he misrepresented himself as a doctor in order to molest his victims.

In rebuttal, the prosecutor played the tape of an interview that appellant gave to police in which appellant stated that D. and his brother were dependent upon him for rides and acknowledged transporting them to Pathfinders' meetings and on weekend trips.

## II.   Procedural History

On March 25, 2008, petitioner was charged with: (1) count one, lewd and lascivious act on a child, in violation of California Penal Code section 288(a), against C. Doe; (2) count two, continuous sexual abuse of a child under fourteen years in violation of California Penal Code section 288.5(a), against D. Doe, committed between August 23, 1993 and March 29, 1995; and (3) count three, lewd and lascivious act on a child under fourteen in violation of California Penal Code section 288(a), against D. Doe, committed between March 30, 1996 and April 6, 1996. Lodgement, Ex. 1, Vol. 2, RT at 329-336. On April 2, 2008, a jury convicted petitioner on counts two and three.[1] The trial court imposed an upper-term sentence of sixteen years on petitioner for his conviction on count two. Lodgement, Ex. 1, Vol. 2, RT at 441. For count three, the court imposed a two-year sentence. *Id.*

On April 30, 2008, petitioner filed a timely notice of appeal to the California Court of Appeal for the Sixth District. Lodgement, Ex. 1, Vol. 2, RT at 443. On December 15, 2009, the Court of Appeal affirmed the trial court's judgement. Lodgement, Ex. 6. Petitioner sought review from the California Supreme Court on January 24, 2010. Lodgement, Ex. 7. The California Supreme Court denied review on March 10, 2010. Lodgement, Ex. 8.

---

[1] The jury was unable to reach a verdict on count one. Lodgement, Exhibit 1, Vol. 2, RT at 399.

On June 7, 2011, petitioner filed the "mixed" petition for habeas corpus review that is currently before the Court. Docket No. 1, Petition. The petition contained six claims that were exhausted on direct review and three that petitioner did not exhaust. *Id.* On March 5, 2012, the Court issued an order striking the three unexhausted claims from the petition. Docket No. 10 at 2-3.

In the six remaining claims, petitioner asserts that the trial court: (1) improperly based venue on a law that violates the Ex Post Facto Clause; (2) improperly admitted evidence of uncharged offenses in violation of petitioner's right to due process; (3) improperly instructed the jury in violation of his right to due process; (4) improperly admitted expert testimony in violation of his right to due process and his rights under the confrontation clause; (5) improperly excluded impeachment evidence in violation of his right to present a defense; (6) improperly sentenced petitioner to an upper term in violation of his right to due process and his right to a jury trial.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), ©. The petition contains six claims that were exhausted on direct review and three claims that petitioner failed to exhaust. On March 5, 2012, the Court issued an order striking the three unexhausted claims from the petition. *See* Docket No. 10 at 2-3. Accordingly, the Court will address the six exhausted claims below.

United States District Court
For the Northern District of California

**STANDARD OF REVIEW**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**DISCUSSION**

**I.      Ex Post Facto Violation**

Petitioner contends that his convictions as to counts two and three violate the Ex Post Facto Clause of the United States Constitution. Petition at 8.[2] Petitioner argues that the prosecution improperly relied on California Penal Code § 784.7, which was enacted after the offenses were committed, to bring offenses that occurred in Madera and Napa counties before the Santa Clara County Superior Court. *Id.* Petitioner implies that without these Madera and Napa offenses the prosecution could not have charged and convicted him on counts two and three. *Id.*

In California, the general rule for venue is that, absent a statutory exception, venue in a criminal proceeding is set in the county or judicial district in which the crime was committed. *See* Cal. Penal Code § 777; *People v. Simon*, 25 Cal. 4th 1082, 1093-94 (2001). California Penal Code § 784.7 is a statutory exception to that general rule. *See* Cal. Penal Code § 784.7. This section gives courts the authority to consolidate in a single venue trials of multiple offenses for crimes such as domestic violence, child abuse or molestation involving the same defendant. *See People v. Betts*, 34 Cal. 4th 1039, 1059 (2005); *Price v. Sup. Court*, 25 Cal. 4th 1046, 1071(2001) ("Section 784.7 creates a multicounty venue for trial of offenses involving sexual or child abuse by the same defendant against the same victim."). As petitioner points out, section 784.7 was not in effect at the time he committed the criminal acts.[3]

The California Court of Appeal rejected petitioner's Ex Post Facto Clause challenge to the prosecution's reliance on section 784.7. First, the Court of Appeal explained that section 784.7 was not being applied retroactively because a new law addressing the conduct of trial has only a prospective effect, as it is only applied to trials occurring after the law's effective date. Lodgement, Ex. 6 at 14-15. Second, the Court of Appeal held that section 784.7 merely reflects a procedural change in the law, i.e., it did not alter the definition of criminal conduct or increase the punishment for a crime. *Id.* at 15-16.

Article I, section 10 of the United States Constitution prohibits States from passing any ex post facto law. U.S. Const. art. I, § 10, cl. 1. "To fall within the ex post facto prohibition, a law must be

---

[2] When citing the Petition the Court will refer to the pagination given to the document by CM/ECF.

[3] The offenses were alleged to have occurred between 1993 and 1996. Lodgement, Ex. 1, Vol. 2, RT at 329-336. California Penal Code § 784.7 was enacted in 1998. *See* 1997 Cal Stats. ch. 302.

United States District Court
For the Northern District of California

retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (citations omitted); *see also Collins v. Youngblood*, 497 U.S. 37, 43 (1990) ("Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."). Generally, a law that changes the procedure by which a case is adjudicated does not violate the Ex Post Facto Clause even if it disadvantages the defendant. *See Collins*, 497 U.S. at 45. However, a legislature cannot not immunize a law from scrutiny under the Ex Post Facto Clause simply by labeling it procedural. *Id.* A procedural change in the law may constitute an ex post facto violation if it affects matters of substance by depriving a defendant of substantial protections with which the existing law surrounds the person accused of the crime. *Id.* The Supreme Court has explained that a law affects matters of substance if (1) it punishes as a crime an act previously committed, which was innocent when done; (2) it makes more burdensome the punishment for a crime, after its commission; or (3) it deprives one charged with crime of any defense available according to law at the time when the act was committed. *Id.* (quoting *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925)). "In *Carmell v. Texas*, 529 U.S. 513 (2000), the [Supreme] Court added that a law which 'alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender' also violates the [Ex Post Facto] Clause." *Wilson v. Belleque*, 554 F.3d 816, 831 n.4 (9th Cir. 2009) (quoting *Carmell*, 529 U.S. at 530, 534-35).

Here, the prosecution's reliance on section 784.7 did not violate the Ex Post Facto Clause because the enactment of section 784.7 was merely a change in the procedural law governing venue. *See People v. Posey*, 32 Cal. 4th 193, 200 (2004) ("[V]enue is a procedural question involving the appropriateness of a place for a defendant's trial on a criminal charge, and not a substantive question relating to the defendant's guilt or innocence of the crime charged."); *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 512-13 (9th Cir. 1988) (stating that issues of venue are procedural). As the Court of Appeal noted the enactment of 784.7 did not alter the definition of criminal conduct or increase the punishment for a crime. The enactment of 784.7 also did not deprive petitioner of any available defense or substantively alter the legal rules of evidence in order to convict petitioner. Section 784.7 merely

"creates a multicounty venue for trial of offenses involving sexual or child abuse by the same defendant against the same victim." *Price v. Sup. Court*, 25 Cal. 4th 1046, 1071(2001). Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. Therefore, petitioner is not entitled to habeas relief on this claim.

## II.   Evidence of Uncharged Sexual Misconduct

Petitioner contends that the trial court improperly admitted evidence of uncharged sexual misconduct in violation of his due process rights. Petition at 8. Petitioner argues that this evidence was so unduly prejudicial that it allowed the jury to convict him based solely on his propensity to commit sexual misconduct.[4] *Id.*; *see also* Lodgement, Ex. 3 at 12-14.

During his criminal proceedings, the trial court allowed three witnesses to testify, under California Evidence Code §§ 1108 and 1101, regarding the sexually abusive relationships they had with petitioner when they were between the ages of fourteen and seventeen. Lodgement, Ex. 2, Vol. 5, RT at 516-521, 580, 562. In the trial at issue, petitioner was not charged with crimes against any of the three witnesses. Petition at 8. However, in a prior proceeding, petitioner was found guilty of molesting two of the three witnesses. *See* Lodgement, Ex. 3, App. Brief at 12. On direct review, the California Court of Appeal held that the admission of this evidence did not violate petitioner's due process rights because the California Supreme Court has held that the admission of evidence of a criminal's propensity does not offend fundamental due process principles. Lodgment, 6 Ex. at 19-20 (citing *People v. Falsetta*, 21 Cal. 4th 903, 914-15 (1999)).

"Simple errors of state law do not warrant federal habeas relief." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). The improper admission of evidence will only provide a basis for habeas relief if "'it rendered the trial fundamentally unfair in violation of due process.'" *Holley*, 568 F.3d at 1101. Evidence

---

[4] The Court will address petitioner's argument that the jury instruction allowed a conviction based solely on propensity evidence in Section III.

introduced by the prosecution will often raise more than one inference, some permissible, some not, and it is up to the jury to sort out the inferences in light of the court's instructions. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. *Id.* (emphasis in original).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further restricts this already stringent standard. The Ninth Circuit has explained that, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established federal law,' as laid out by the Supreme Court." *Holley*, 568 F.3d at 1101. Where the Supreme Court has not adequately addressed a claim, a court cannot use precedent from a lower court to find a state court ruling unreasonable. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

First, even assuming that the evidence admitted by the court was purely propensity evidence and was not relevant to any other issue, AEDPA precludes federal habeas relief because the United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process. *See Estelle v. McGuire*, 502 U.S. at 62, 75 n.5 (1991) ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); *see also Mejia v. Garcia*, 534 F.3d 1036, 1047 (9th Cir. 2008) ("[T]he United States Supreme Court has never established the principle that introduction of evidence of uncharged offenses necessarily must offend due process."). Because the Supreme Court has elected to leave this an open issue, a trial court's decision to admit propensity evidence does not violate clearly established federal law as determined by the Supreme Court. *See Mejia*, 534 F.3d at 1046; *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008).

Second, the admission of the evidence did not violate petitioner's due process rights because the jury could draw permissible inferences from the evidence. Under California law, prior crimes evidence is admissible to prove motive, opportunity, intent, preparation, plan, or identity. Cal. Evid. Code § 1101(b). At trial, the prosecutor sought to admit evidence of the uncharged sexual misconduct in hopes that the similarity between the charged and uncharged offenses would show petitioner's intent to commit the charged offenses. As the Court of Appeal emphasized, the uncharged sexual conduct was sufficiently

13

United States District Court
For the Northern District of California

1  similar to establish petitioner's intent based on the "nature of the acts, the location of the abuse, the age

2  and gender of the victims, and their association with appellant's church and the school attended by his

3  children."  Lodgement, Ex. 6 at 23.  As the Ninth Circuit explained in *Jammal*, "evidence introduced by

4  the prosecution will often raise more than one inference"; the admission of evidence only violates the

5  Due Process clause "if there are *no* permissible inferences the jury may draw from the evidence."  926

6  F.2d at 920 (emphasis in original).  Here, the evidence of the uncharged offenses was permissible to

7  establish petitioner's intent to commit the charged offenses. *See* Cal. Evid. Code § 1101(b).  Therefore,

8  the admission of the evidence did not violate petitioner's due process rights.

9      Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable

10  application of, clearly established Federal law, as determined by the Supreme Court.  Therefore,

11  petitioner is not entitled to habeas relief on this claim.

12

13  **III.    Jury Instruction**

14      Petitioner argues that jury instruction CALCRIM No. 1191, which sets forth how a jury may

15  consider evidence of uncharged offenses, violated his due process rights by permitting the jury to find

16  him guilty based solely on his propensity to commit an offense.  Petition at 8-9.  The California Court

17  of Appeal rejected this argument and held that the instruction contained in CALCRIM No. 1191 is

18  constitutional.  Lodgement, Ex. 6 at 24-26 (citing *People v. Reliford*, 29 Cal. 4th 1007 (2003); *People*

19  *v. Schnabel*, 150 Cal. App. 4th 83, 87 (2007)).

20      To obtain federal relief for alleged errors in a jury instruction, the petitioner must show that the

21  "'ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"

22  *See Estelle v. McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  "Even

23  if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not

24  necessarily constitute a due process violation."  *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009).  In

25  reviewing an instruction, the inquiry is not how reasonable jurors could or would have understood the

26  instruction; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has

27  applied the challenged instruction in a way that violates the Constitution by, for example, relieving the

28  State of its burden of proving every element of the crime beyond a reasonable doubt. *See id.* at 190-91;

*Estelle*, 502 U.S. at 72.

14

1    The challenged jury instruction, CALCRIM No. 1191, gave the jury specific instructions on how

2    to consider the uncharged offenses.  CALCRIM No. 1191 explicitly instructed the jury that if they found

3    that defendant committed the uncharged offenses, they could conclude, but were not required to

4    conclude, "that the defendant was disposed or inclined to commit sexual offenses."  They were

5    cautioned, however, that the uncharged offenses are ". . . only one factor to consider along with all the

6    other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the crimes charged in

7    counts 1, 2 or 3." Lodgement, Ex. 1, Vol. 2, RT at 356; *accord* CALCRIM No. 1191.  The instruction

8    also explains that "[t]he People must still prove each element of every charge beyond a reasonable

9    doubt." *Id.*  Petitioner fails to point to anything in CALCRIM No. 1191 that implies that the jury could

10   convict petitioner based solely on his propensity to commit sexual misconduct.  As such, there is no

11   constitutional defect in the jury instruction, and there is no likelihood that the jury applied the instruction

12   in a way that violates the Constitution.  Therefore, the trial court's use of CALCRIM No. 1191 did not

13   violate petitioner's due process rights.  *See Kralovetz v. Grounds*, No. C 11-1552 JSW (PR), 2014 U.S.

14   Dist. LEXIS 39532, at *44-46 (N.D. Cal. Mar. 25, 2014) (holding that the petitioner was not entitled to

15   habeas relief based on the trial court's use of CALCRIM 1191); *Rodriguez v. Wanda*, C-13-0015-EMC,

16   2013 U.S. Dist. LEXIS 173489, at *14-23 (N.D. Cal. Dec. 11, 2013) (same); *see also Schultz v. Tilton*,

17   659 F.3d 941, 943-45 (9th Cir. 2011) (denying petitioner's claim based on the use of the prior version

18   of CALCRIM No. 1191, CALJIC NO. 2.50.01, because the jury instruction "made clear that [the

19   defendant] could be convicted only if the evidence as a whole proved [him] guilty beyond a reasonable

20   doubt of the charged crime").

21   Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable

22   application of, clearly established Federal law, as determined by the Supreme Court.  Therefore,

23   petitioner is not entitled to habeas relief on this claim.

24

25   **IV.    Expert Testimony**

26   Petitioner contends that the admission of the testimony of Carl Lewis,  an expert on Child Sexual

27   Abuse Accommodation Syndrom ("CSAAS"), violated his right to confrontation and his right to present

28   a defense under the Sixth and Fourteenth Amendments. Petition at 9.  Petitioner argues that this type of

testimony has been criticized by the Ninth Circuit, and it has been found to be an impermissible way of

1   bolstering the credibility of a child witness.  *Id.* (citing *Franklin v. Henry*, 122 F.3d 1270, 1273 (9th Cir.

2   1997); Docket No. 24, Traverse at 13-14.  The California Court of Appeals rejected this claim, holding

3   that petitioner had failed to properly object to the admission of the CSAAS evidence and that the

4   admission of the evidence in the case was appropriate.  Lodgement, Ex. 6 at 28-29.

5        Under federal review, "[t]he admission of evidence does not provide a basis for habeas relief

6   unless it rendered the trial fundamentally unfair in violation of due process."  *Holley*, 568 F.3d at 1101.

7   Evidence introduced by the prosecution will often raise more than one inference, some permissible, some

8   not, and it is up to the jury to sort out the inferences in light of the court's instructions.  *Jammal*, 926 F.2d

9   at 920.   "Only if there are *no* permissible inferences the jury may draw from the evidence can its

10   admission violate due process."  *Id.*  (emphasis in original).

11        AEDPA further restricts this already stringent standard.  The Ninth Circuit has explained that,

12   "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair

13   may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established federal

14   law,' as laid out by the Supreme Court."  *Holley*, 568 F.3d at 1101.  Where the Supreme Court has not

15   adequately addressed a claim, a court cannot use precedent from a lower court to find a state court ruling

16   unreasonable.  *Musladin*, 549 U.S. at 77.

17        Contrary to petitioner's assertions, the Ninth Circuit has found that the admission of CSAAS

18   evidence in child-sexual-abuse cases is proper when "the testimony concerns general characteristics of

19   the victims and is not used to opine that a specific child is telling the truth."  *Brodit v. Cambra*, 350 F.3d

20   985, 991 (9th Cir. 2003) (citing *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) (per curiam);

21   *United States v. Antone*, 981 F.2d 1059 (9th Cir. 1992)).  Further, the Ninth Circuit has also rejected the

22   contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes

23   effective challenges to the truthfulness of their testimony – the very arguments that Petitioner advances

24   here."  *Id.*  Therefore, petitioner's claim is foreclosed by the Ninth Circuit's decision in *Brodit*.  The trial

25   court only allowed the CSAAS expert to testify about the general nature of the syndrome.  *See*

26   Lodgement, Ex. 2, Vol. 7 RT at 735-763.  The expert explained to the jury that he did not interview any

27   of the witnesses nor did he know the specific details of the case.  *Id.* at 744.  The trial court also gave

28   specific limiting instructions that the testimony was not evidence that petitioner committed the crimes

charged against him.  *Id.* at 33.  Thus, the CSAAS testimony complied with the limits set out by the Ninth

Circuit in *Brodit*, and the admission of the testimony did not violate petitioner's due process rights. *See Nuno v. Davey*, No. 11-02446 SBA (PR), 2014 U.S. Dist. LEXIS 98945, at *30-32 (N.D. Cal. Jul. 21, 2014) (rejecting petitioner's challenge to the admission of CSAAS evidence as foreclosed by *Brodit*). In addition, petitioner cites to no Supreme Court authority to support his claim that the trial court's decision to admit the CSAAS evidence violated his right to due process. *Id.* at *31.

Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. Therefore, petitioner is not entitled to habeas relief on this claim.

**V.     Impeachment Evidence**

Petitioner contends that the trial court violated his right to present a defense under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment by precluding him from establishing that the victim's mother had a financial motive for pursuing a criminal case against him. Petition at 9-10. Specifically, petitioner argues that he was not able to impeach the victim's mother with her statement to the defense investigator that she was aware that other molestation victims obtained financial judgements against petitioner. *Id.* The California Court of Appeal held that the trial court did not abuse it discretion in excluding the evidence and that no constitutional violation occurred. Lodgement, Ex. 6 at 34.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment,[5] the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *accord Green v. Georgia*, 442 U.S. 95, 97 (1979). A trial court retains wide latitude to exclude evidence that is repetitive or only

---

[5] In regard to petitioner's Confrontation Clause argument, the Supreme Court has expressly stated that it "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013). (emphasis in original). Thus, there was no violation of clearly established federal law as set out by the Supreme Court. Therefore, the Court will limit its analysis to petitioner's due process argument.

United States District Court
For the Northern District of California

1    marginally relevant. *See Crane*, 476 U.S. at 689-90; *Holmes*, 547 U.S. at 326-27. "Only rarely has [the

2    Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense

3    evidence under a state rule of evidence." *Jackson*, 133 S. Ct. at 1992. Moreover, even if this Court

4    found a violation of petitioner's constitutional rights, the error would only provide grounds to grant a writ

5    of habeas corpus if it had a "substantial and injurious effect or influence in determining the jury's

6    verdict." *Brecht*, 507 U.S. at 637.

7         The trial court precluded the impeachment testimony under California Evidence Code § 352.

8    Lodgement, Exhibit 2, Vol. 7 RT at 927. Evidence Code § 352 gives the trial court discretion to exclude

9    evidence if its probative value is substantially outweighed by the probability that its admission will

10   necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the

11   issues, or of misleading the jury. Cal. Evid. Code § 352. Here, petitioner's motivation for impeaching

12   the victim's mother was to establish that she pursued the case for her family's financial gain. Petition

13   at 9. However, as the trial court noted, the victim's mother had already testified that she had not, and did

14   not, intend to pursue a civil action for damages. Lodgement, Ex. 2, Vol. 7 RT at 927. The trial court

15   further explained that the value of the testimony was diminished because the defense attorney intended

16   to impeach the victim's mother, rather than the victim himself. *Id.* Moreover, as the Court of Appeal

17   noted, the victim's mother ultimately impeached herself by testifying on direct examination that she was

18   not aware of anyone receiving any monetary compensation because petitioner had molested them, but

19   then on cross-examination she admitted she had "heard something about it." Lodgement, Ex. 6 at 33.

20   Therefore, the record shows that the purported impeachment evidence was repetitive and was only

21   marginally relevant, not critical, to petitioner's defense. Thus, the trial court's decision to exclude this

22   evidence from the trial did not violate petitioner's due process rights. *See Crane*, 476 U.S. at 689-90;

23   *Holmes*, 547 U.S. at 326-27. In addition, petitioner has failed to show that the exclusion of this evidence

24   had a substantial or injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S.

25   at 637.

26        Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable

27   application of, clearly established Federal law, as determined by the Supreme Court. Therefore,

28   petitioner is not entitled to habeas relief on this claim.

United States District Court
For the Northern District of California

**VI.     Sentencing**

Petitioner contends that the trial court violated his right to due process and his right to a jury trial under the Sixth and Fourteenth Amendments by sentencing him to an upper term. Petition at 10. Specifically, he contends that the trial court violated the Supreme Court's holding in *Cunningham v. California*, 549 U.S. 270 (2006), by sentencing him to an upper term based on facts not found true by the jury. Petition at 10. The California Court of Appeal rejected petitioner's claim, citing *People v. Sandoval*, 41 Cal. 4th 825, 845-57 (2007). Lodgement, Ex. 6 at 36-37.

In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." The statutory maximum is the maximum sentence a judge can impose based solely on the facts reflected in the jury verdict or admitted by the defendant, "[it] is the maximum he could impose *without* any additional findings." *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004) (emphasis in original).

In *Cunningham v. California*, the United States Supreme Court held that California's determinate sentencing law violated the Sixth Amendment because it authorized judges, not the jury, to find facts permitting a sentence above the statutory maximum. 549 U.S. at 273. Following *Cunningham*, the California Legislature amended the determinate sentencing law to change the statutory maximum from a middle-term sentence to the upper term by granting the judge full discretion between imposing the lower, middle or upper term based solely on the facts reflected in the jury verdict or admitted by the defendant. *See* Cal. Penal Code § 1170. Since the amendment, the California Supreme Court has upheld the law as constitutional. *See Sandoval*, 41 Cal. 4th at 857. However, neither the Ninth Circuit nor the United States Supreme Court has explicitly ruled on its constitutionality.

The trial court sentenced petitioner to the upper term of sixteen years for his conviction as to count two, continuous sexual abuse of a child under fourteen years. Lodgement, Ex. 6 at 1-2. The trial court cited four factors, which were not found true by a jury, as the reasons for imposing the upper-term sentence: (1) petitioner took advantage of a position of trust; (2) the manner in which the crimes were carried out indicated planning and sophistication; (3) the victim was particularly vulnerable; and (4) the petitioner's "sexually assaultive behavior" presented a serious danger to society. *Id.*

United States District Court
For the Northern District of California

When the Legislature enacted section 1170 it changed the statutory maximum, the maximum sentence a judge can impose based solely on the facts reflected in the jury verdict or admitted by the defendant, from the middle term to the upper term. *See* Cal. Penal Code § 1170; *Sandoval*, 41 Cal. 4th at 843-45. Thus, when the trial court sentenced defendant to the upper term, it sentenced petitioner to the statutory maximum, which according to the United States Supreme Court, does not require a separate finding of fact by a jury. *See Blakely*, 542 U.S. at 303-04; *see also United States v. Booker*, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."). Therefore, the trial court's decision to impose an upper-term sentence based on the factors cited above did not violate petitioner's right to due process or his right to a jury trial. *See Creech v. Trimble*, No. CV 11-03670 CRB, 2013 U.S. Dist. LEXIS 97188, at *23-25 (N.D. Cal. Jul. 11, 2013); *Neri v. Allison*, No. C 10-2867 RMW (PR), 2012 U.S. Dist. LEXIS 43157, at *30-35 (N.D. Cal. Mar. 28, 2012). Further, as discussed above, the United States Supreme Court has not explicitly ruled on the constitutionality of the amended section 1170.

Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. Therefore, petitioner is not entitled to habeas relief on this claim.[6]

///

---

[6] In the Traverse, petitioner seeks leave to amend the petition to include a claim that his upper term sentence violated the Due Process Clause and the Ex Post Facto Clause. Docket No. 24, Traverse at 17. Petitioner argued that the imposition of an upper term sentence violated his due process rights in his original petition and that contention has been addressed above. With respect to his claim that the sentence violates the Ex Post Facto Clause, petitioner argues that he was sentenced on the basis of laws that were not in effect at the time of his conviction. *Id.* However, the Ninth Circuit has held there are no ex post facto concerns if the sentencing court follows the California Supreme Court's instructions in *Sandoval* and resentences a defendant under the amended § 1170. *See Chioino v. Kernan*, 581 F.3d 1182, 1185-86 (9th Cir. 2009) ("resentencing under the *Sandoval* procedure raises no ex post facto concerns"); *Butler v. Curry*, 528 F.3d 624, 652 n.20 (9th Cir. 2008). Therefore, petitioner's sentence does not violate the Ex Post Facto Clause. Accordingly, petitioner's proposed claim is futile, and, thus, the Court denies petitioner's request for leave to amend the petition. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

**CONCLUSION**

For the foregoing reasons, the petition for the writ of habeas corpus is DENIED.  A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  King may seek a certificate of appealability from the Ninth Circuit Court of Appeals.  The clerk shall enter judgement in favor of respondent and close the file.


**IT IS SO ORDERED.**

Dated: August 26, 2014

_____
SUSAN ILLSTON
United States District Judge